UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

CASSANDRA FRAZIER, individually and as next of kin to her deceased husband, NELSON LEE FRAZIER, JR. A/K/A "MABEL" A/K/A "VISCERA" A/K/A "BIG DADDY V" A/K/A "KING MABEL," and as personal representative of THE ESTATE OF NELSON LEE FRAZIER, JR., DECEASED,

    Plaintiff,

v.

WORLD WRESTLING ENTERTAINMENT, INC.,

    Defendant.

Case No. 2:15-cv-02198

# SUBMISSION OF WORLD WRESTLING ENTERTAINMENT, INC. PURSUANT TO THE COURT'S ORDER OF APRIL 29, 2015

Eugene J. Podesta, Jr.
gpodesta@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell
    & Berkovitz, PC
First Tennessee Building
165 Madison Avenue
Suite 2000
Memphis, Tennessee 38103
(901) 577-2213 (phone)
(901) 577-0761 (facsimile)

Jerry S. McDevitt (pro hac vice)
Curtis B. Krasik (pro hac vice)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222-2613
Telephone: (412) 355-6500
Facsimile: (412) 355-6501
E-mail: jerry.mcdevitt@klgates.com
curtis.krasik@klgates.com

*Attorneys for Defendant World Wrestling Entertainment, Inc.*

World Wrestling Entertainment, Inc. ("WWE") makes this submission in response to Plaintiff's Supplemental Memorandum filed on May 14, 2015. Plaintiff's submission was not in compliance with the Court's Order of April 29, 2015 (Dkt. 22) granting leave to submit a brief of no more than 15 pages by May 13, 2015 addressing two specific issues.[1] In light of Plaintiff's failure to brief only the two issues for which the Court granted leave, and the highly inflammatory and unsupported rendition of events in Plaintiff's submission, a brief counter-statement of the true nature of this case is in order.

I.  **COUNTER-STATEMENT OF THE CASE**

Although the actual merits of the case are not at issue in the context of the motion to transfer, the poisonous allegations of the Complaint and the invective contained in Plaintiff's Supplemental Memorandum might lead the Court to credit the allegations if not addressed to some degree. Needless to say, WWE strongly disputes the allegations of the Complaint and it is immediately self-evident that the assertions in the Supplemental Memorandum are completely unsupported by any factual evidence.

Contrary to the narrative constructed in the Complaint that WWE is in the business of violence, WWE is an entertainment company.[2] WWE creates superheroes and supervillains who clash in the ring pursuant to storylines created by WWE. WWE enters into contracts with talent from all over the world to perform these roles, and Mr. Frazier was one such talent. Contrary to

---

[1] The Court's order followed oral argument on WWE's motion to transfer venue due to mandatory forum selection clauses contained in three separate contracts between the decedent, Nelson Frazier, and WWE. Mr. Frazier also signed a fourth contract with WWE in which the parties agreed to submit disputes to binding arbitration in Stamford, Connecticut. The Sixth Circuit regards arbitration clauses "as a particular type of forum-selection clause." *Moses v. Business Card Exp., Inc.*, 929 F.2d 1131, 1138 (6th Cir. 1991).

[2] This is not the only case in which pleadings were filed with scandalous and factually inaccurate allegations against WWE. Plaintiff's Massachusetts counsel did so in other cases before federal courts in Oregon and Connecticut. In both cases, such problematic allegations were called to his attention and in both cases he indicated the complaints would be amended.

the insulting depiction of his intelligence in Plaintiff's Supplemental Memorandum, Mr. Frazier freely entered into four different contracts with WWE. He also performed for many other promotions when not under contract to WWE. *See* Ex. 1. During his time with WWE, Mr. Frazier portrayed several character roles created by WWE. Far from being enslaved by adhesion contracts, Mr. Frazier performed for WWE for very logical reasons. In the eight years in which he performed in at least 30 WWE events in a calendar year, he was paid very well, as follows:

| | | |
|---|---|---|
| 1994 - $127,659.15 | 2000 – $136,951.85 | 2007 – $178,359.64 |
| 1995 – $100,648.28 | 2005 – $124,252.74 | 2008 – $251,023.65 |
| 1999 – $159,081.44 | 2006 – $152,659.51 | |

*See* Ex. 2. Mr. Frazier last performed for WWE on March 11, 2008. *See* Compl. ¶ 406. Thereafter, he continued to perform for other wrestling promotions. *See* Ex. 1. On February 18, 2014, nearly six years after his last affiliation with WWE, Mr. Frazier collapsed at his residence and was pronounced dead later that evening. The medical examiner did no autopsy, and ruled the death to be from natural causes. *See* Ex. 3. The death certificate lists hypertensive cardiovascular disease as the cause of death, with morbid obesity and diabetes listed as other significant conditions contributing to death. *See* Ex. 4. The toxicology report indicated the presence of alcohol and drugs. *See* Ex. 3. Significantly, Mr. Frazier was cremated, thereby destroying any ability to determine if he had the neurodegenerative disease known as CTE, which requires a post-mortem dissection of the brain.

A few months after his death, his widow reached out to WWE in the spring of 2014 claiming she was destitute and about to be evicted from her residence. WWE helped her out, and advanced $10,000 to her against future royalties. On May 13, 2014, she posted favorable comments about WWE on her Facebook page. *See* Ex. 5.

In October 2014, Plaintiff's Massachusetts counsel filed a purported class action against WWE in federal court in Oregon relating to alleged brain injuries and CTE. He has now filed, or caused to be filed, three virtually identical purported class actions in Oregon, Pennsylvania and California. The Pennsylvania case involved two former-wrestlers who signed identical forum

2

selection clauses as Frazier, and Mr. Kyros did not oppose the transfer of that case to the federal court of Connecticut. Shortly thereafter, he decided to attempt to avoid that Court's jurisdiction and caused to be filed an entirely duplicative class action in federal court in California, which WWE is also moving to transfer to Connecticut.

In February 2015, Mr. Kyros caused this suit to be filed, with 124 pages of allegations, most of which have absolutely nothing to do with Mr. Frazier, but which camouflage the true nature of the frivolous claims made here while garnering media attention for his efforts. Specifically, despite the fact Mr. Frazier was cremated, the complaint alleges he had CTE. CTE can only be diagnosed by an autopsy of the brain, as has been alleged in other cases filed by Plaintiff's Massachusetts counsel. On top of that allegation, which cannot be proven, the Complaint attempts to weave a most implausible claim — that Mr. Frazier's heart attack was directly caused by such alleged brain injuries which put him in "a worse-off state of well-being . . . which . . . more likely than not attributed [sic] to Nelson Frazier's heart attack and his inability to survive the heart attack." Compl. ¶¶ 511, 516.

It is against this background that WWE moved the Court to transfer the claim to Connecticut, the same forum which Plaintiff's Massachusetts counsel already agreed was appropriate in a matter involving an identical forum selection clause.

## II. ORAL ARGUMENT AND PRIOR ADMISSIONS OF PLAINTIFF'S COUNSEL

During oral argument, Plaintiff's counsel, Mr. Gilreath, conceded that Plaintiff could not prove that the forum selection clauses were fraudulent or that Connecticut was an unfair venue or so seriously inconvenient as to destroy Plaintiff's right to justice. Dkt. 24 at 2. Despite the candid admission of Plaintiff's Tennessee counsel, Mr. Kyros then argued that the "enforceability and the forum selection clause itself is generally disfavored in common law" and made the insulting remark that WWE wants to "bring all these cases to its own court and

3

essentially strip the wrestler of any rights they would have under state tort law claims."³ *Id.* at 29-30. In response, the Court correctly noted that Plaintiff had not alleged that the forum selection clauses were obtained through fraud, duress or unconscionable means. *Id.* at 30. The Court further noted that the Sixth Circuit's decision in *Wong* did not seem to favor Plaintiff's position. *Id.* The Court then asked Mr. Kyros if he had any Connecticut law indicating that the contract was unconscionable. *Id.* at 31. Mr. Kyros admitted he had no cases to cite for such a proposition. *Id.* The Court remarked that it had no reason to believe the District Court in Connecticut would not do a fine job on any such issues that came before it.

Given the admission that there is no evidence that the forum selection clauses were obtained by fraud or unconscionable means, the Court inquired whether Plaintiff's position required proof that the contracts as a whole were unconscionable. *Id.* at 32. Mr. Kyros gave a response that sounded like an admission that Plaintiff could not show that the contracts were unconscionable, and the Court can consult the transcript to see if it accurately reflects the Court's memory of what he said. *Id.* at 32. Counsel for WWE then pointed out that the combined admissions of Plaintiff's counsel left nothing for decision. *Id.* at 36-37. Thereafter, the Court indicated to Plaintiff's counsel that it was "somewhat in agreement with your opposing counsel that it sounds like you may have conceded a few points there," *id.* at 37; *see also id.* at 41:9-10. Mr. Gilreath again candidly admitted that, if looking exclusively at the forum selection clause, he could not assert it was unconscionable as it talks only about the forum and "doesn't discuss any nature or anything else that would look on its face to be unconscionable." *Id.* at 38. Counsel for Plaintiff then continued to argue that Section 9 of the contract should not be enforced but freely acknowledged that the Connecticut courts could decide that issue, stating: "It's not like we are

---

³ The notion that forum selection clauses are disfavored in common law is a ship that sailed long ago and the Supreme Court has issued opinion after opinion lauding such clauses and directing trial courts to routinely enforce them, including the unanimous decision in *Atlantic Marine*. As to the notion that transfer would strip wrestlers of rights under state tort law, Connecticut has state tort law. As Mr. Gilreath admitted, Connecticut is not Ecuador. *See* Dkt. 24 at 39.

talking about some low level court in Ecuador or some other far away place in a different – with a different legal tradition. We are talking about two federal courts." *Id.* at 39.

Following oral argument, the Court issued its April 29th order granting leave to Plaintiff to address any contention that "the contract as a whole is substantively unconscionable." Dkt. 22 at 2. In doing so, the Court indicated that *Wong v. Partygaming Ltd.*, 589 F. 3d 821 (6th Cir. 2009) may not be dispositive because it did not concern an allegation that the contract as a whole was unenforceable. The Court also cited *Evans v. Linden Research, Inc.*, 763 F. Supp. 2d 735, 739 (E.D. Pa. 2011) for the proposition that state, not federal, law may apply when evaluating whether or not the terms of a contract are unconscionable. The Court granted Plaintiff leave to submit no more than 15 pages by May 13, 2015 addressing two specific issues: (1) whether state or federal law governs a claim that a contract as a whole is unenforceable as substantively unconscionable, and (2) whether the contracts at issue in this case are substantively unconscionable under Connecticut law.

### III. ARGUMENT

#### A. Plaintiff Did Not Comply With the Court Order

Plaintiff arrogantly ignored the deadline and the page limit set forth in the Court's April 29th Order, and completely disregarded that leave was given to address two specific issues. Instead of addressing whether federal or state law governed whether the contracts as a whole were unconscionable, Plaintiff blatantly redefined what they were given leave to brief as including whether "any claim alleged in the present case fall outside the scope of the clauses," and then tried to present arguments about the consortium claim never made in their initial opposition.

After redefining the actual order, Plaintiff failed to cite a single case actually holding that the unconscionability of a contract was grounds not to enforce a forum selection clause contained therein. WWE's research has not revealed any case actually refusing to enforce a forum selection clause due to unconscionability of the contract containing it, but has located ample

5

authority holding that is not a proper analysis on a motion to transfer. Likewise, Plaintiff has cited no authority establishing that a court could simply declare multiple contracts to be unconscionable without any evidence. There is no law authorizing a trial court to simply accept as true the completely unsupported assertions made by Plaintiff in their submission.[4]

**B.    Plaintiff's Counsel's Admissions Makes It Impossible for Them to Prove Extraordinary Circumstances Unrelated to The Convenience of The Parties**

WWE has found no Sixth Circuit decision on whether state or federal law governs a claim that a contract as a whole is unenforceable due to substantive unconscionability. WWE respectfully submits, however, that the Sixth Circuit and Supreme Court consistently reject the idea that general attacks on the contract as a whole are to be the focus of a trial court called upon to enforce a forum selection clause. Instead, the focus is to be on the clause itself.

Thus, WWE respectfully submits that the admissions made by Plaintiff's counsel during oral argument are dispositive. The admission that there is no evidence of fraud in connection with the inclusion of the forum selection clauses, coupled with the admissions that the forum selection clauses were not themselves unconscionable and that the Connecticut court would fairly decide all other contractual or legal issues, essentially admit that Plaintiff cannot satisfy any of the three factors set forth in *Wong* for evaluating the enforceability of a forum selection clause. *See* 589 F.3d at 828. Under the first factor of *Wong*, this Court is to evaluate is "whether ***the clause*** was obtained by fraud, duress or ***unconscionable*** means." *Id.* (emphasis added). The Sixth Circuit emphasized that "the party opposing the clause must show fraud in the inclusion of

---

[4] As set forth herein, the complaint demonstrates that allegations are being made that cannot be proven, such as the allegation that Frazier has CTE when that fact could not be proven. Indeed, the jurist presiding over the NFL litigation recently issued an opinion noting that CTE can only be diagnosed post-mortem by direct exam of brain tissue, and which called into question the accuracy of statements about the supposed state of the science at the epicenter of the claims asserted here. *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2015 WL 1822254, at *42-43 (E.D. Pa. Apr. 22, 2015). Here, one must question the factual basis for all the hyperbolic descriptions of Frazier's dealings with WWE, since he is deceased and clearly could not provide such information.

the clause itself" and that advancing general claims of fraud, rather than fraud directed at the clause itself, is insufficient. *Id.* The second factor of *Wong*, whether the federal court in Connecticut would unfairly handle the case, was conceded not to be an issue, as was the third factor.

Neither the Sixth Circuit nor the Supreme Court has ever held that a general attack on the enforceability of a contract would render a forum selection clause unenforceable in the absence of evidence regarding fraud or unconscionability in the clause itself. To the contrary, in addition to *Wong*, both Courts have consistently rejected such a notion and have repeatedly emphasized that the focus is narrow and specific to the clause itself. In *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), the Supreme Court held that forum selection clauses should be given full effect when "a freely negotiated private . . . agreement [is] unaffected by fraud." 407 U.S. at 12. Since that language might have been construed to indicate that an attack on the contract itself might be grounds not to enforce a forum selection clause, the Supreme Court later clarified that passage did *not* mean that a forum selection clause was unenforceable any time a dispute arising out of a transaction is based on fraud allegations. Instead it meant that a "forum selection clause in a contract is not enforceable *if the inclusion of that clause in the contract* was the product of fraud or coercion." *Schenk v. Alberto-Culver Co.*, 417 U.S. 505, 519 n.14 (1974) (emphasis added). The Sixth Circuit relied on this passage from *Schenk* in *Moses* to reiterate that there must be "a well-founded claim of fraud in the inducement of the clause itself, *standing apart from the whole agreement*, to render an arbitration clause unenforceable." 929 F.2d at 1138 (emphasis in original). Noting that an arbitration clause "is a particular type of forum selection clause," the Sixth Circuit held that "unless there is a showing that the alleged fraud or misrepresentation induced the party opposing a forum selection clause *to agree to inclusion of that clause* in the contract, a general claim of fraud or misrepresentation as to the entire contract does not affect the validity of the forum selection clause." *Id.* (emphasis in original); *see also Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718 (6th Cir. 2006) (general claims of fraud do not suffice to invalidate forum selection clauses).

7

The reason for the narrow and specific focus was alluded to by the Court during oral argument. A claim that the contract as a whole is unconscionable is the epitome of a dispute arising under and related to the contract and exactly the type of dispute which falls squarely within the scope of the forum selection clause. There is no reason to believe a federal judge in Connecticut would not decide those issues, as this Court observed during oral argument.

As noted, WWE has not found any authority for the proposition that a district court can properly deny a motion to enforce a forum selection clause due to alleged unconscionability of the contract itself. The case cited by the Court in its April 29th Order, *Evans v. Linden Research, Inc.*, 763 F. Supp. 2d 735 (E.D. Pa. 2011), was decided prior to *Atlantic Marine*, but does not hold that enforcement can be denied on the grounds that the contract itself, as opposed to the forum selection clause itself, was unconscionable. In fact, the court focused on the forum selection clause itself, stating that "a forum selection clause may be unenforceable where it is found to be unconscionable." *Evans*, 763 F. Supp. 2d at 739. As such, *Evans* is in accord with *Wong*, which also held the focus was to be on whether the clause itself was obtained by fraud, duress or unconscionable means. *Evans* did not cite a single case actually holding that a forum selection clause was unenforceable on the grounds that the contract itself was unconscionable, let alone a case refusing to uphold a forum selection clause admitted not to be unconscionable, as is the case here. In fact, the Court in *Evans* noted the modern trend, even prior to *Atlantic Marine's* strong directive to lower courts, is to enforce forum selection clauses and transferred the case to California.

Likewise, in *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229 (E.D. Pa. 2007), cited by *Evans* for the proposition that state law determines if contract terms are unconscionable, the claim there was that the agreement "and ***in particular*** the forum selection clause are unconscionable." *Id.* at 239 (emphasis added). In *Feldman,* the forum selection clause was in an internet "click wrap" agreement. Even though the clause was in a non-negotiated form contract, the Court noted that such a clause was not "shocking to the conscience," which is the typical standard for substantive unconscionability under state laws. The court ruled that the party

8

seeking to enforce the clause had a legitimate interest in limiting the forum because it could be subject to suit in many different fora because its customers came from many locations. WWE has exactly the same interest, as its talent come from many jurisdictions. In support of its conclusion to enforce the clause, the Court found that the Supreme Court had upheld such clauses in standardized, non-negotiated contracts, and noted that such clauses dispel confusion over where suit is to be brought, conserving both litigation and judicial resources.

The theme that an attack on the enforceability of a forum selection clause must focus on the clause itself is consistently applied when similar claims are made that a contract is an adhesion contract or was presented on a take-it-or-leave-it basis. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593-94 (1991) (upholding forum-selection clause printed on the back of a form ticket contract not subject to negotiation); *Smith v. AEGON Cos. Pension Plan*, 769 F3d 922, 930 (6th Cir. 2014) (upholding forum-selection clause in amendment to pension plan that "was not the product of an arms-length transaction"); *Fireman's Fund Ins. Co. v. M.V. DSR Atlantic*, 131 F.3d 1336 (9th Cir. 1998) (whether contract is an adhesion contract is irrelevant where there is no ambiguity in forum selection clause); *Robles v. Comtrack Logistics, Inc.*, No. 2:13-cv-00161-JAM-AC, 2015 WL 153-510, at *4 (E.D. Cal. Apr. 2, 2015) (must "show that the inclusion of the clause itself into the agreement was improper; it is insufficient to allege that the agreement as a whole was improperly procured"); *Lorenzana v. 2nd Story Software, Inc.*, No. 4:12CV-00021-JHM, 2012 WL 2838645, at *3-4 (W.D. Ky. July 10, 2012) (rejecting argument that forum-selection clause contained in an adhesion contract was unenforceable because "Plaintiffs have failed to demonstrate fraud in the inclusion of the forum selection clause itself"); *Hegwer v. Amer. Hearing and Assocs.*, 2012 WL 629145 (N.D. Cal. 2012 ("[W]hether other provisions of the Employment Agreement are unconscionable is not germane to the salient issue presented; namely, whether the plaintiff has carried his heavy burden of establishing that the forum selection clause is unreasonable"); *Jenkins v. Marvel*, 683 F. Supp. 2d 626, 636-37 (E.D. Tenn. 2010) ("[E]ven if the Court credits Plaintiff's assertion that there was unequal bargaining power and this was a contract of adhesion, the [forum-selection] clause is not necessarily unfair

9

because circumstances do not support a finding that the forum selection clause is oppressive or unconscionable."); *Sneed v. Wellmark Blue Cross and Blue Shield of Iowa*, No. 1:07-CV-292, 2008 WL 1929985, at *3 (E.D. Tenn. Apr. 30, 2008) ("The Supreme Court previously rejected a claim a forum selection clause should be set aside because it was an adhesive contract. . . Regardless of whether Plaintiffs had actual knowledge of the clause, the clause is not made unenforceable merely because Defendant presented it as a take it or leave it proposition.").

> C. **Whether the Contracts Are Unconscionable Is Not At Issue On A Transfer Motion and No Basis Exists to Declare Three Contracts Unconscionable**

As demonstrated, the issue of overall unconscionability is not germane to the narrow issue before the Court, and there is no evidence offered by Plaintiff in any event. Under Connecticut law, an unconscionable contract is "one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept on the other." *Smith v. Mitsubishi Motors*, 247 Conn. 342, 349 (1998). Plaintiff appears to be suggesting that Frazier was delusional in agreeing to the contracts with WWE. Yet, there is hardly anything delusional about entering into a contract to perform for the leading company in his profession which will pay him a six figure income and make him famous, as occurred here.

The doctrine of unconscionability "requires a showing that the contract was both procedurally and substantively unconscionable when made." *Bender v. Bender*, 292 Conn. 696, 732 (2009). "Under Connecticut law, a court cannot find procedural unconscionability unless the party opposing enforcement . . . has introduced *specific* evidence of overreaching." *Daimler Chrysler Ins. Co. v. Pambianchi*, 762 F. Supp. 2d 410, 423 (D. Conn. 2011) (emphasis added). The Connecticut Supreme Court has also soundly rejected the notion that a party with greater bargaining power must direct the other party's attention to important provisions, as suggested here. *See Smith*, 247 Conn. at 352; *D'Antuono v. Serv. Rd. Corp*, 789 F. Supp. 2d 308, 328 (D. Conn. 2011). Plaintiff has alleged, but not shown, that the contracts were take-it-or-leave-it employment contracts. There is no rule in Connecticut that treats such contracts as procedurally

10

unconscionable. *FCT Elecs., LP v. Bank of Am.*, *N.A.*, No. CV106002699, 2011 WL 4908850, at *6 (Conn. Super. Sept. 22, 2011) (internal quotations and citation omitted). As to substantive unconscionability, the terms must be so one-sided as to "shock the conscience." *Id.* At the same time, courts are not to be thrust into a paternalistic role of changing contract terms merely because the court believes the terms are unreasonable. *Id.*

Notwithstanding Plaintiff's counsel's attempt to portray the three booking contracts as a fool's bargain, the contracts in reality comprehensively define the responsibilities of both parties. The contracts begin by noting that WWE's business operations gave Frazier opportunities at public exposure which increased the value of his services. Section 1 of the contract obligated WWE to book Frazier to appear at WWE events, and WWE did so for many years. If an event is televised, it is paid for and produced entirely by WWE, and Section 2 of the contract specifies that WWE is the sole and perpetual owner of its recorded works, much like any producer of events such as the NFL, NBA, etc. The league not the players own the works, just as WWE does. If Frazier owned any trademarks coming into the deal which he would use to perform, he licensed such marks to WWE *during the term* of the contract per Section 3.1. Conversely, if WWE created a persona and associated trademark for him to portray, WWE owned that intellectual property per Section 3.2, much like the creator of Batman or other superheroes. Section 4 deals with merchandising rights, which permits Frazier to be included in WWE's extensive-licensing program and earn royalties for doing so on things like toy figurines, lunchboxes, T-shirts and the like. Those provisions benefit Frazier by creating a revenue stream that continues after the contracts expired. In Section 4.1, Frazier granted WWE the perpetual rights to use his name and intellectual property in connection with the exploitation of any copyrighted works he had appeared in, such that when WWE would sell DVDs of shows it could still use his name to tell consumers he was among the performers depicted on the DVD. Section 7 of his last contract obligated WWE to pay him a minimum amount of $100,000, with the opportunity to make much more, which he did. Section 7 spells out in great detail what royalties he would earn and the percentages to be paid. Section 7.14 obligated WWE to provide royalty

11

statements to Frazier each quarter, and granted him audit rights to verify the accuracy of the royalty accounting. Section 8 extensively detailed WWE's obligations to bear all costs of venue rental, liability insurance, state and local taxes, equipment, security and all the costs of producing and distributing the shows on which Frazier appeared. WWE obligated itself to bear all the costs of obtaining product licenses and administering the licenses, making Frazier's participation in those revenue streams entirely at no cost to him.

Section 9 set forth Frazier's obligations, including his own training and physical conditioning, and the obligation to avoid unreasonable risk of injury to himself and others. Section 9.5 specified what he was to do if he or an opponent were injured during a match. Section 9.12 contains important provisions allocating certain financial responsibilities to Frazier, an independent contractor, to obtain liability and workman's compensation insurance. Section 9.12(b) and (c) contain his acknowledgement that there is inherent risk of serious injury involved in his profession for which he freely assumed full responsibility. Plaintiff now contends those sections are not enforceable under Connecticut law, and they would be free to present any arguments to the Connecticut court. Notably, Section 13.4 provides that if any portion of the agreement is held to be unenforceable, the remainder shall be given full effect. *See Feldman*, 513 F. Supp.2d at 243. Thus, even if a Connecticut court were to decide that Frazier's assumption of the risk due to the negligence of WWE or other wrestlers was not enforceable, it would still be obligated to uphold his assumption of the inherent risks. Indeed, even in the setting where there are not compensated professionals participating in athletic-type endeavors involving full contact, as is the case here, Connecticut law holds that one does assume responsibility for risks inherent in the activity. *Hanks v. Powder Ridge Rest. Corp.*, 276 Conn. 314, 325-26 (2005).

In sum, although not an issue properly before the Court, it is clear that the contracts contain mutual obligations and provided Frazier with lucrative compensation. Contracts with such mutual obligations that pay a man over $250,000 in the last year are certainly not "shocking to the conscience" or a fool's bargain.

### D. Plaintiff's Loss Of Consortium Claim Is Subject To the Forum Selection Clauses In The Decedent's Contracts With WWE

The very authorities cited in Plaintiff's Supplemental Memorandum expressly found that a consortium claim is "derivative of the injured spouse's cause of action," *Hopson v. St. Mary's Hospital*, 176 Conn. 485, 494 (1979), but this dispositive point is simply ignored by Plaintiff.[5] . "Loss of consortium, although a separate cause of action, is not truly independent, but rather derivative and inextricably attached to the claim of the injured spouse." *Izzo v. Colonial Penn. Ins. Co.*, 203 Conn. 305, 312 (1987).[6] Plaintiff's derivative loss of consortium claim, therefore, equally falls under the forum selection clause and must be transferred to Connecticut.

"[A] party does not have to be a signatory to the contract to be subject to a forum selection clause." *BNY AIS Nominees Ltd. v. Quan*, 609 F. Supp. 2d 269, 275 (D. Conn. 2009). "In order to bind a non-party to a forum selection clause, the party must be closely related to the dispute such that it becomes foreseeable that it will be bound." *Id.* (internal quotation marks and citation omitted).[7] "A non-party is closely related to a dispute if its interests are completely derivative of and directly related to, if not predicated upon, the signatory party's interests or conduct." *Morag v. Quark Expeditions, Inc.*, No. 3:07-cv-1062(PCD), 2008 U.S. Dist. LEXIS 59207, at *15 (D. Conn. Aug. 5, 2008) (internal quotation marks and citation omitted). A plaintiff is bound by a forum selection clause signed by her spouse where her interests are

---

[5] The Court should disregard Plaintiff's argument in its entirety because it was not raised in her opposition brief and the Court did not permit further briefing on the issue of whether the forum selection clause encompasses Plaintiff's loss of consortium claim. *See* Dkt. 22 at 3.

[6] Loss of consortium also is a derivative claim under Tennessee law. *See Tangradi v. Baptist Mem'l Hosp. of Union City*, No. 1:10-cv-01115-JDB-egb, 2012 WL 2681806, at *8 (W.D. Tenn. July 6, 2012); *Tuggle v. Allright Parking Sys.*, 922 S.W.2d 105, 108 (Tenn. 1996). In addition, Plaintiff's claim under Tennessee's wrongful death statute is a derivative claim. *See Southwell v. Summit View of Farragut, LLC*, 494 Fed. Appx. 508, 513 (6th Cir. 2012) (Tennessee law).

[7] Courts in Tennessee have applied the same principles regarding forum selection clauses. *See Shaffer v. Interbank FX*, No. 3:12-cv-231, 2013 WL 53979, at *5 (E.D. Tenn. Jan. 3, 2013); *Hasler Aviation, L.L.C. v. Aircenter, Inc.*, No. 1:06-cv-180, 2007 WL 2463283, at *3 (E.D. Tenn. Aug. 27, 2007).

derivative of her spouse's interests. *See Lipcon v. Underwriters at Lloyd's*, 148 F.3d 1285, 1299 (11th Cir. 1998) (affirming "district court's conclusion that the spouses are bound by the [forum selection] clauses" because "the interests of the spouses in this dispute are completely derivative of those of" the parties to the forum-selection clauses); *see also Tellez Chios Sea Ship & Trading S.A.*, 247 F.3d 241, at *1 (5th Cir. 2001) (affirming district court's ruling that "next-of-kin of a deceased Nicaraguan seaman is bound by the foreign forum selection clause contained in the seaman's contract of employment when bringing a wrongful death action against the seaman's employer."); *Brenner v. Nat. Outdoor L'ship Sch.*, 20 F. Supp. 3d 709, 716, 719 (D. Minn. 2014) (granting motion to transfer venue and holding that forum-selection clause was binding on the trustee of the decedent's heirs in a wrongful death action).

Even if Plaintiff's loss of consortium claim did not fall within the scope of the forum selection clause, it should be transferred with the other claims in the interest of justice and efficiency. During oral argument, this Court recognized that it may be more efficient to transfer Plaintiff's individual claim with the other claims that undeniably fall within the scope of the forum selection clause. *See* Dkt. 24 at 40. Connecticut courts also have recognized that "claims by spouses, whether for physical injuries or consortium losses, [should] be joined in one action and tried before a single trier of fact." *Hopson*, 176 Conn at 494. "[R]equiring both claims to be resolved simultaneously promotes efficiency and conserves judicial resources by protecting against the repeated litigation of the same underlying issues." *Voris v. Molinaro*, 302 Conn. 791, 800 (2011) (internal quotations and citations omitted). "This is because, in order to subject a defendant to liability to a deprived spouse for illness or bodily harm done to the impaired spouse, all of the elements of a tort action in the impaired spouse must [be proven to] exist." *Id.* (internal quotation marks and citations omitted).

Because Plaintiff's loss of consortium claim should be joined with the other claims in this action, the Court should transfer that claim to the District of Connecticut as well. *See Jones v. Custom Truck & Equip.*, LLC, No. 3:10-CV-611, 2011 WL 250997, at *6 (E.D. Va. Jan. 25, 2011) ("Considerations of judicial economy, convenience, and the interest in avoiding piecemeal

litigation dictate transferring the remaining claims as well."); *Miller v. Facebook, Inc.*, No. 1:09-CV-2810-RLV, 2010 WL 9525523, at *4 n.1 (N.D. Ga. Jan. 15, 2010) ("Even if this claim did not fall within the forum selection clause's broad scope, the court would exercise its discretion to transfer this claim as well to avoid piecemeal litigation and to conserve judicial resources."); *Food Mktg. Consultants, Inc. v. Sesame Workshop*, No. 09-61776-CIV, 2010 WL 1571206, at *14 (S.D. Fla. Mar. 26, 2010) (transferring remaining claims because splitting the case between two jurisdictions would be wasteful of the resources of the parties and the courts); *McNair v. Monsanto Co.,* 279 F. Supp. 2d 1290, 1308 (M.D. Ga. 2003) (stating that claims that did not fall within a forum selection clause would still be subject to transfer in the interest of justice and to promote an efficient use of resources).

## IV. CONCLUSION

For all of the foregoing reasons, and the reasons set forth in WWE's Memorandum of Law in Support of Motion to Transfer Venue, and Reply in Support of Motion to Transfer Venue, WWE's Motion to Transfer Venue should be granted and this case should be transferred to the U.S. District Court for the District of Connecticut.

Dated: May 19, 2015				Respectfully submitted,

					By:	s/ Eugene J. Podesta, Jr.
						Eugene J. Podesta, Jr.
						gpodesta@bakerdonelson.com
						Baker, Donelson, Bearman, Caldwell
						    & Berkovitz, PC
						First Tennessee Building
						165 Madison Avenue
						Suite 2000
						Memphis, Tennessee 38103
						(901) 577-2213 (phone)
						(901) 577-0761 (facsimile)

						Jerry S. McDevitt  (pro hac vice)
						Curtis B. Krasik  (pro hac vice)
						K&L GATES LLP

15

K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA  15222-2613
Telephone:  (412) 355-6500
Facsimile:  (412) 355-6501
E-mail: jerry.mcdevitt@klgates.com
curtis.krasik@klgates.com

*Attorneys for Defendant World Wrestling Entertainment, Inc.*

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing SUBMISSION OF WORLD WRESTLING ENTERTAINMENT, INC. PURSUANT TO THE COURT'S ORDER OF APRIL 29, 2015 was served by the Court's CM/ECF System to all counsel registered to receive electronic notice.

Dated:  May 19, 2015               <u>s/ Eugene J. Podesta, Jr.</u>